## AFFIDAVIT OF DAVID X. O'NEILL

I, David O'Neill, being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed for approximately 23 years. I am currently assigned to the Logan Airport Task Force ("LATF") based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP") and special agents of the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics, and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following:

    a.     $36,000.00 in United States currency, seized from Mohamed Fadel Salah at Logan International Airport in Boston, Massachusetts on March 13, 2019 (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5. This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the DEA, MSP and the LATF, as well as my review of records and reports relating to the investigation.

6. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate such a violation.

7. On March 13, 2019, the Transportation Security Administration ("TSA") contacted MSP at Boston's Logan International Airport and requested that Troopers respond to the passenger screening checkpoint in Terminal B. TSA advised that there was a large amount of cash found in the possession of a departing passenger. At approximately 4:00 p.m. MSP Sgt. Steve Lopes and I arrived at the check point. We were dressed in plain clothes and did not have any weapons or police insignia exposed.

8. The departing passenger, Mohamed Fadel Salah ("Salah") was traveling on American Airlines Flight 1453 Boston, MA to Charlotte, NC. The flight's departure time was scheduled for 4:11 p.m. The boarding time for the flight was 3:36 p.m. In Charlotte, Salah was scheduled to connect to American Airlines flight 596, Charlotte, NC to San Diego, CA.

9. I have learned that Salah's ticket was purchased approximately three minutes before this flight was scheduled to board in Boston. I have also learned that the ticket was purchased by Muqtar Mohamud.

10. Based on my training and experience, and that of numerous DEA airport interdiction groups, drug money couriers often wait until very close to flight time to book their reservations. In my experience, drug money couriers also wait until the last minute to check-in for their flights because they believe they will receive less scrutiny from law enforcement at the airport. In addition, it is common, in my experience, for smugglers of drug proceeds to have their ticket purchased for them by other members of the drug trafficking organization.

11. Since Boston, MA is not a source area for drugs such as cocaine, heroin, methamphetamine, and oxycodone, traffickers need to import these drugs from other source areas from within and outside of the United States. The LATF has seized and forfeited hundreds of thousands of dollars travelling through Logan International Airport to source-city destinations throughout California, specifically San Diego.

12. I identified myself to Salah using my Department of Justice issued credentials. I advised Salah that he was not in trouble and that he was not under arrest, and I told Salah that he was free to leave at any time. Salah confirmed that he had already missed his American Airline's flight and stated that he was willing to speak with us.

13. Salah said that he was a truck driver and was traveling to San Diego to purchase a truck. Salah showed us a video of the specific truck that he said he was interested in purchasing. As discussed below, Salah would later claim, without explanation, that this same video displayed the truck he actually already owned and that he was going to California to buy a different truck.

14. When I asked Salah for the seller's contact information, Salah looked away, swallowed hard, and answered, "[n]o. I'm not going to buy that specific truck. I am also going to the auction to look there too." Salah was unable to provide the name of the auction or its location. Salah stated that he wanted to purchase the truck in California because, "[t]rucks are cheaper

3

there." I asked more questions about the truck that Salah displayed on his telephone. Salah was unable, however, to provide specific information such as the truck specifications, or where he planned to meet the seller.

15. Based on my training and experience, Salah's story, and his lack of specific information about the truck he was purportedly travelling to purchase, is further indicia that the seized Currency is drug money. Members of the LATF, myself included, have encountered numerous bulk cash smugglers who attempt to hide their criminal activity by concocting stories about purchasing expensive items such as real property or vehicles. In addition, Salah's statement that "[t]rucks are cheaper [in California]" is a statement that I and other members of the LATF have heard from multiple other drug money couriers. Despite the frequency of this claim, members of the LATF have found no evidence supporting it. In fact, I have been informed that California sales tax can range from 7.25% to 10.25% and additional fees may apply in certain cities and jurisdictions in California when selling/buying a vehicle. The additional expense of traveling to California to purchase the car and transporting it to its final destination would likely reduce any discount obtained by purchasing in California, if such a discount existed. In addition, I am aware that by purchasing an airline ticket last minute, such as the ticket purchased for Salah, travelers often pay a higher fare than travelers that purchase the ticket in advance.

16. I asked additional questions about how Salah came to possess the cash. Salah provided numerous and different accounts of where, why, and how he possessed the cash. As his explanations multiplied, they contradicted themselves.

17. In one instance, Salah said he was from North Dakota and traveled from Minneapolis to Portland, ME to meet with friends who loaned him $35,000 or $36,000 to purchase his truck. Salah later stated that "10" different people lent him $35,000 but he was unable to

4

provide the purported lenders names or contact information. Salah said he arrived in Portland, ME on Friday, March 8, 2019 and that his "community" lent him the cash to purchase the truck as part of a Somalian cultural lending system. However, shortly thereafter he claimed that the money was his money and he retrieved it from a friend who has been holding the money on his behalf.

18. Salah then told us that he received the money the day before, March 12, 2019, in Portland, ME. Salah was unable to identify the people involved in lending him the cash but stated that he got it at Louie's house. I have learned from a review of law enforcement records, that Louie is an alias for Muqtar Mohamud. Muqtar Mohamud is the name of the person that purchased Salah's airline ticket.

19. Salah asked me to speak to a male voice on his telephone. Salah represented the voice as the man who gave him (Salah) the cash in Maine. The voice later identified himself to me as Jamal Ali. When I asked this person on the phone ("Ali") questions about the cash, such as when and where the cash transaction took place, how much money was provided, and what was the purpose of the cash, he was unable to provide any answers. While I was on the phone, I could hear other men in the background trying to coach Ali. Ali eventually told me that I would have to speak with Ali's uncle for any details about the cash. Ali would not provide the uncle's name. Salah told me that he did not know Jamal Ali's uncle's name.

20. Salah then told us that the friends who lent him the money were from Minnesota. Salah was unable to explain why they were meeting in Maine to do the cash transaction if they were all from Minnesota.

21. Salah also told me that he was employed as a truck driver. Salah offered that he owned a truck, which he described as a Volvo that he purchased one month prior. Salah told me that he wished to purchase a second truck to grow his business. As Salah was explaining this, he

showed Sgt. Lopes and me a video of the truck he owned. I saw that this was the same video Salah had previously shown us of the truck he was allegedly buying in San Diego. Salah was insistent that the truck he was showing us was his truck, but he was unable to explain his prior inconsistent statement and display of the same video. Salah stated that the truck he currently owned was in need of repair and not operated.

22. When I asked Salah the license plate number to his current truck, Salah was unable to do so. Salah stated that a friend of his was going to take a picture of the license plate and sent it to Salah. Salah later produced a photograph of a Minnesota license plate resting on a table, not affixed to a vehicle. However, when I checked the license plate number in the Criminal Justice Information System, I received the response, "NOT ON FILE." I attempted to check the license plate number using several other methods but each method produced the same type of response. Salah also provided a Vehicle Identification Number (VIN) for the truck. When I ran the VIN, I also received "NOT ON FILE" response. A colleague in Minneapolis later attempted to locate the license plate and VIN and also received "NOT ON FILE" response.

23. Salah stated that the last time he worked was in November of 2018 and that he earned approximately $4,000 per week as a trucker. According to surveys found online, truck drivers are paid .27¢ to .40¢ per mile. Even if Salah was even paid .50¢ per mile he would still need to drive 8,000 miles per week to make $4,000. This equates to driving over 1,000 miles per day, seven days a week. If he drove at an average speed of 65 miles per hour, Salah would need to drive 17 hours per day which is unlikely because it is a violation of strict regulations governing truck driver's work hours.

24. Despite travelling with a significant sum of cash, Salah told us that he had bank accounts at Wells Fargo and Chase banks.

25. While still at the checkpoint Salah later said that that $20,000 of the Currency was his and, contrary to what Salah said about borrowing the money, he told us he earned the money driving trucks. He said that he brought the cash to Maine in November of 2018 for Ali to "hold." Salah told us that Ali "held" the money for him and when Salah needed the money, Salah traveled back to Maine to collect it. I told Salah that I found his explanation incredible and that I was detaining the Currency to have a drug detection K-9 examine it at the nearby F Troop MSP barracks.

26. We moved the Currency to the nearby F Troop barracks. Prior to the K-9 team's arrival, the Currency was hidden out of sight of the K-9 and its handler. MSP K-9 handler, Tpr. Brian Bonia, alongside his K-9 partner Maximus, responded to the barracks. Subsequently, Maximus located and alerted to the Currency, indicating to the presence of narcotics odor on the Currency.

27. Tpr. Bonia has been employed by the MSP since 2004 and has been assigned to the MSP K-9 unit since March 2008. Maximus is a 10-year old German Shepard and is used to detect controlled substances in different situations, including interdiction investigations. In October of 2008, Tpr. Bonia and Maximus attended and successfully completed a 320-hour course in narcotic detection through the New England State Police Administrators Conference (NESPAC).

28. Tpr. Bonia and K-9 Maximus attend recertification on a yearly basis. As a result, Maximus is certified to detect marijuana, cocaine, heroin, and methamphetamine. Since the initial NESPAC accreditation course, Tpr. Bonia and K-9 Maximus have maintained their training at a minimum of 16 hours per month. Tpr. Bonia advised that searches conducted by K-9 Maximus have led to the seizure of marijuana, cocaine, heroin and methamphetamine.

29. The Currency was subsequently seized and counted, during which time a strong odor of marijuana emanated from it. The Currency totaled $36,000 and was comprised of 1,800 twenty dollar bills.

24. The next day, March 14, 2019, Salah returned to the MSP Troop F barracks. Salah was accompanied by Ahmed Mohamed who periodically reminded Salah to, "Calm down bro." Salah said that he returned to Troop F to show me a photograph of a document that was stored on his telephone. Salah said the document was the title for his truck, which he owned and parked in Minnesota.

25. While Salah was at the barracks he told me that I could not "hold against [him] what [he] said yesterday." He said "I was tired. So it doesn't count." I asked Salah about his American Airlines reservation for his trip to San Diego, CA the day before. Salah stated that he made the reservation himself. I knew Salah's ticket was purchased by Muqtar Mohamud. I asked Salah if he knew Muqtar Mohamud, and he denied knowing him. When I asked Salah how he purchased his American Airlines reservation, Salah produced a ReadyCard. ReadyCard is a prepaid credit card system that allows customers to provide payment, including cash, in exchange for the prepaid card. ReadyCard can be purchased in many places, including Boston Logan Airport. Much like a credit card, each ReadyCard has a unique number used to complete subsequent financial transactions. Despite his assertion that this card was used to purchase his ticket, the number on the card did not match the reservation for his airline ticket. Although Salah said he did not know Muqtar Mohamed, I later learned that on March 10, 2019, Salah was stopped by the police in Lewiston, ME while operating Muqtar Mohamud's vehicle.

## Conclusion

27.     Based upon the information set forth above, probable cause exists to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate such a violation.

Signed under the penalty and pains of perjury this _10_ day of September, 2019.

_____
David X. O'Neill
Special Agent
Drug Enforcement Administration

9|10|2019

LESLIE A. MCCARTHY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 8, 2021